**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------- X
                      :

**UNITED STATES,**                   :

                        :   **Case No. 14-cr-00427 (VSB)**

                        :

      **-against-**               :

                        :

                        :

**ALEX EKDESHMAN,**          :

                        :

            **Defendant.**     :
----------------------------------------------------------------- X

 

**DEFENDANT ALEX EKDESHMAN'S**
**<u>MEMORANDUM IN AID OF SENTENCING</u>**

 

 

                        **Ronald P. Fischetti, Esq.**
                        **Attorney for Defendant**
                         **Alex Ekdeshman**
                        **Fischetti & Malgieri LLP**
                        **747 Third Avenue, 20th floor**
                        **New York, New York   10017**
                        **212-593-7100**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
                                   :

UNITED STATES,                          :

                                   :    Case No. 14-cr-00427 (VSB)
                                   :

       -against-                     :
                                   :

                                   :

ALEX EKDESHMAN,                   :

                                   :

                Defendant.       :
----------------------------------------------------------------- X

## I.    INTRODUCTION

On February 2, 2015, Alex Ekdeshman stood before this Court and pleaded guilty to one count of Commodities Fraud pursuant to Title 7, United States Code, §§60(1), 13(a)(1), and 13(a)(5).  As is typical in virtually all criminal matters that are resolved through a guilty plea, the information now before the Court with respect to Mr. Ekdeshman is limited to his admitted participation in this crime.  However, we submit this memorandum on behalf of Mr. Ekdeshman to aid the Court in crafting a fair and reasonable sentence by providing a relevant background dimension into Mr. Ekdeshman's character, as well acknowledging certain other factors that we submit are pertinent to this matter.

Imposition of sentence by Your Honor on June 22, 2015 will be, in many ways, the end of an ordeal that Mr. Ekdeshman and his family have lived through since his arrest on May 2, 2014.  ███████████████████████

██████████████████████████████████

██████████████████████   ████████████████

1

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

A Judge's responsibility when sentencing a defendant is undoubtedly a difficult task. As this Court is surely aware, there are a variety of factors that the Court must consider in determining the appropriate sentence—not simply the offense of conviction, but the history and characteristics of the defendant as well. For this reason, we have attached as exhibits a host of letters from the family and community of Mr. Ekdeshman that provide valuable insight into who Mr. Ekdeshman is. We submit that these letters, which illustrate a genuine concern for a hardworking, resilient and industrious man whom many have known for many years, should not be overshadowed by the lapse of judgment that underlies Mr. Ekdeshman's offense conduct.

Mr. Ekdeshman has accepted full responsibility for his conduct and as discussed below, there are factors that militate in favor of leniency, including his family circumstances concerning his son's cancerous tumor, as well as his own problems with substance abuse. ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ We urge Your Honor to consider the value of such mitigating aspects to this case and sentence Mr. Ekdeshman to a below-guidelines sentence.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████

## II.  DISCUSSION

### A.  LEGAL STANDARD

"It has been uniform and constant in the federal judicial tradition for the sentencing Judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).   Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams v. People of State of New York*, 337 U.S. 247, 247, 69 S.Ct. 1079 (1949).

As Your Honor is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing Judge can impose a sentence.   The sentencing court may consider the Guideline range, as well as any basis to depart from that range.   However the court is no longer required to impose a sentence within that range, and in fact, the Federal Sentencing Guidelines are but one factor among several in determining an appropriate sentence.   *Kimbrough v. United States*, 128 S.Ct. 554, 574 (2007).   The Guidelines are only the "starting point and initial benchmark..." *Id., citing Gall v. United States*, 128 S.Ct. 586, 596 (2007). "Sentencing courts are not to 'presume that the Guidelines range is reasonable,' and instead they 'must make an individualized assessment based on the facts presented.'"

*United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (internal citations omitted). It is the sentencing Judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the §3553(a) factors. *Kimbrough, 128 at 574, citing Gall*, 128 at 596.

The overarching command of Section 3553(a) is that sentences should be "sufficient, but not greater than necessary" to achieve the basic goals of retribution, deterrence and *rehabilitation*. *See* 18 U.S.C. § 3553(a) (emphasis added). In determining a sentence that is "sufficient, but not greater than necessary," the first of those factors the Judge must consider is the "nature and circumstances of the offense and the history and characteristics of the defendant." *Id*. Without a doubt, the breadth of this factor alone extends far beyond the Guidelines and implores the sentencing Judge to consider the unique circumstances and characteristics of the defendant in each case. A consideration of those characteristics, along with the remaining seven factors,[1] may render sentences that do not fit within the Guidelines, yet are fair and meet the goals of sentencing set forth in §3553(a)(2).

Therefore the Court may not simply presume that the Guidelines range is reasonable. *Gall*, 128 S.Ct. at 597. Rather, the Court must make an individualized assessment based on the facts presented. From its unique vantage, the Court may conclude that, despite the Guidelines "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing. . ." *Kimbrough*, 128

---

[1] The seven other factors are (1) the nature and circumstance of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to reflect on sentencing set forth in §3553(a)(2); (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense; (5) the Commission's policy statement; (6) the need to avoid unwarranted sentence disparities of similar defendants who commit similar crimes; and (7) the need to provide restitution to victims. 18 U.S.C. §3553(a).

S.Ct. at 570, *citing* 18 U.S.C. §3553(a).  The not "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law" and "provide just punishment for the offense."  18 U.S.C. §3553(a).  Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case.  *Gall*, 128 S.Ct. at 599; *see also Rita v. United States*, 127 S.Ct. 2456, 2465 (2007) (observing that district court may consider arguments that "Guidelines sentence itself fails properly to reflect §3553(a) considerations").

As argued below, we submit that a within Guidelines sentence, capped at a maximum term of imprisonment of 10 years would be "greater than necessary" to achieve the Sentencing Commission's basic goals of retribution, deterrence and rehabilitation.  *See* 18 U.S.C. §3553(a).  Furthermore, the above-described Guidelines provide for arguably arbitrary enhancements that do not properly calculate the [non-violent] nature of the offense, the harm to victims, nor the culpability of the defendant.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████

### III.   THE SENTENCING FACTORS

### A.   MR. EKDESHMAN'S BACKGROUND AND CHARACTERISTICS SUPPORT THE REQUESTED SENTENCE

On April 28 2015, the Probation Department for the Southern District of New York completed the Presentence Investigation Report (the "PSR") to assist Your Honor

with Mr. Ekdeshman's sentencing.[2]   We respectfully request that Part C, entitled *Offender Characteristics*, of the PSR be incorporated herein.   In addition, we wish to emphasize certain salient facts about Mr. Ekdeshman's life, as well as highlight the accompanying letters so that this Court may have a better understanding of the man who stands before it for sentencing.   Hopefully Your Honor will notice the trend that emerges from the letters written by those closest to Alex: that he is a devoted family member who has struggled to survive through adversity and life difficulties.

An understanding of Mr. Ekdeshman's youth is essential for the Court's determination of the appropriate sentence.   Alex Ekdeshman, age 42, was born on October 17, 1972 in the Ukraine.   The older of two boys, Alex came to the United States in 1976 and became a naturalized citizen in 1978.   Though his family moved several times when he was young, Alex spent his formative years primarily in Brooklyn, NY.

Raised by Polina and Vladimar Ekdeshman, Alex grew up in a very singular manner.   Instead of parents raising him with a loving hand, dedicated to providing a nurturing home and caring for the rearing of a young man, the Ekdeshmans divorced themselves from parenting.   At a very young age Alex was forced to make decisions for himself—to be responsible for himself and care for himself.   In his early teens, Alex was forced into his first job so that he could provide for his own basic needs.   Without parents to care for him, Alex found himself guided by one strong instinct: survival.   Whereas most children should be raised in a household that provides the guidance one

---

[2] It bears noting that in Probation Officer Kapitansky's recommendation in the PSR, under the section titled *Voluntary Surrender*, Officer Kapitansky states, "[t]he defendant has been detained without bail since his arrest.  He is not a candidate for voluntary surrender because of the provisions found in 18 U.S.C §3143(a)(2)."  PSR, 30 (April 28, 2014).  Mr. Ekdeshman has been released on bail since his arrest. Officer Kapitansky's statement is incorrect and he has advised me that it will be amended prior to sentencing.

needs to acclimate to the tenets of living in society, Alex had no such parental guidance. Whereas most children would ordinarily learn at home that there are rules and one acts within those rules, Alex had no such model.  Whereas most children would suffer a childhood of punishment for acting outside the norms of the family community's boundaries, Alex was without.  Instead, Alex learned by a different mode: asking for forgiveness for his mistakes—after the fact—as opposed to having a system in place that provided guidance, rules and structures within which he could operate.  While Alex's upbringing does not justify his offense conduct, it does explain how he came to run afoul of the rules of law.

For decades Alex has been estranged from his biological family.  In 1996 Alex married his current wife, Alisa Ekdeshman nee Ratsusky, and he finally settled into a caring family life. Married in Brooklyn, NY, their union has produced two children, ███████████████████████████.  The love he and his wife share is rare in this day and age.  Alisa Ekdeshman writes the Court:

> …Alex and I have been together for 24 years of which 19 we are married this year and 5 years we dated as teenagers…I knew from the minute I met him that he had a big heart of gold.

> …Alex's relationship with his parents was never there due to his parents' selfishness…Alex's personality helped him move forward…He was always hard working and had a "can do" attitude about him…He is loyal, devoted, generous and an honest individual…With years it became apparent that Alex is the only person that I would ever want to spend my life with and raise a beautiful family.

Alisa Ekdeshman's letter is attached hereto as Exhibit "A."

Unfortunately in 2014, the Ekdeshmans learned that their son had a cancerous tumor in his armpit.  Doctors in Philadelphia Children's Hospital cannot remove the tumor because of the complex location, so ███████ remains under continuous medical

7

supervision.  Every three months ███████ returns to the doctor for a scan to see if the

tumor has grown or changed.  Alisa Ekdeshman describes the emotional roller coaster

they have been on since ██████'s diagnosis a little over a year ago.  In her letter to the

Court, she describes the family trauma after learning of their son's tumor.  She writes:

> ████████ was diagnosed with a Desmoid Tumor in his right arm axilla on May 1, 2014…There [sic] first available appointment was on May 12, 2014 which was ██████ ██ ██████…We had seen Doctor Dormans…and he sent us for another five MRI scans the following day on May 13, 2014.   Doctor Dormans mentioned that with 25 years of experience he has never seen a tumor like that and in the area that ██████ had it.

> …When Alex and I first found out about this diagnosis it was heart shattering and breaking at the same time since we had no control over this. We could not live our life knowing that something is happening to our son and we can't do anything to help him.   On May 20, 2014██████ surgery was performed and when the doctor walked over to us after the surgery….he was not able to give us any positive information on the tumor.  He also was not able to remove any part of it because of the area it was located…under his right arm pit which has many nerve endings there, lymph nodes, arteries and muscles and no part of it would ever be able to be removed due to the located [sic].  ██████ is required to have 2 MRI's every six months…██████ attends these scans mostly with his father since he feels more secure and comfortable going with him.

*Id*. at pp.2-3.

Although estranged from his own family, Mr. Ekdeshman shares a very close

bond with his Alicia's family.   His mother-in-law, Emma Ratsutsky, sees Mr.

Ekdeshman as more of a son than a son-in-law and his brother-in-law, Neil Ratsutsky,

views Alex as a brother.  Mrs. Ratsutsky writes the Court:

> …I have known Alex since he was a little six year old boy…Alex was nothing short of my second son in our household. He has always treated both my husband and I with the utmost respect.

> …Alex and Alisa are now married for 19 years he has been a fantastic, loving father to his kids, amazing son in law, friend who is always open to helping everyone around him.

Emma Ratsutsky's letter is annexed hereto as Exhibit "B."

Neil Ratsutsky's letter to the Court emphasizes all those times that Mr. Ekdeshman went above and beyond just to let Neil know that he was there for him and he explains the quality time they spent together doing things that "brothers" would do. He writes:

> …Alex has been nothing less than a brother to me from the first time he entered our home.  I can remember countless times growing up when he would take me to the circus, a basketball game, or even just the park.  He never had to do those things, but he always did.  He taught me so many values in doing these things.  Because of the way I grew up under him, I am now an active member in my family with everyone, and more importantly, in my community.

He continues, specifically recalling when he was a teenager sick with the flu:

> …When I was in my early teen years, my parents had been leaving on vacation, and I was so excited to be left at home alone and independent for a few days.  Unfortunately, I caught an extremely nasty case of the flu that had me bedridden for days.  With me being a severe asthmatic, it was very dangerous for me to be left alone, and my parents had already left on vacation…the important part of the story is that he was going to take me to the doctor the next morning…when he woke up in the morning and went to get the car to take me to the doctor, he came outside of our South Brooklyn apartment to find that his new Ford Mustang had been stolen overnight.  It is in these awkward and unfortunate instances in life when a person shows their true character, and Alex immediately came upstairs and called a cab to take me to the doctor first, before dealing with the theft of his new car.  He told me the car issue can wait, but my health comes first.  On that weekend, I gained a new respect for him as a person and a love for him as my brother.

Neil Ratsutsky's letter is annexed hereto as Exhibit "C."

Mr. Ekdeshman has been fighting his own battle – a significant substance abuse problem.  At his arrest, he tested positive for cocaine and was mandated by pre-trial services to address his addiction by seeing a counselor bi-weekly accompanied by random drug testing.  Unfortunately, as Your Honor is aware, Alex appeared in Court

last month as a result of his failed drug testing.  Regrettably, Mr. Ekdeshman has indulged in banned substances as an attempt to deal with the stress from fear of a prospectively harsh sentence, the harm he's caused to his family, and the mistakes he has made relating to his offense conduct.  Though he does not wish to minimize or trivialize substance abuse as a factor pertinent to sentencing, it bears noting that after his relapse, Mr. Ekdeshman consulted with his substance abuse counselor and agreed upon additional group treatment in order to return to a life of sobriety.  While he is dissatisfied that he was weak for relapsing, he is committed to combat his addiction and maintain a healthy lifestyle.

Several other of Mr. Ekdeshman's friends and family have written to Your Honor, including his Rabbi, Chaim Tversky, seeking leniency on Alex's behalf.  These letters provide further insight into Alex's character as a devoted family man selfless to those around him.  The Rabbi's letter informs the Court that Alex has been an active member of the Jewish community and has made many contributions on many different occasions.  Rabbi Tversky views Alex as "an asset to the Jewish community".  The balance of those letters are collectively annexed hereto as Exhibit " D."

### 1. EXTRAORDINARY FAMILY CIRCUMSTANCES MILITATE IN FAVOR OF LENIENCY

It is well settled that Courts recognize extraordinary family circumstances as grounds for imposing lenient sentences.[3]  *See* U.S.S.G §5H1.6; *United States v. Johnson*,

---

[3] While most if not all of the cases we cite are pre-*Booker*, and therefore concern motions for downward departures under U.S.S.G §5H1.6, we submit that either a downward departure or a variance is warranted.  *See Ramirez v. United States*, 2010 WL 3489381 (S.D.N.Y. Sept. 3, 2010) ("Since *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), arguments for variances for aberrant behavior or for extraordinary family circumstances are regularly presented as grounds for sentence variances under 18 U.S.C. §3553, instead of as grounds for departure under the guidelines.").

964 F.2d 124, 129 (2d Cir. 1992) ("Extraordinary family circumstances are widely accepted as a valid reason for departure."); *Id.* (explaining that purpose of departure is to protect not the defendant, but his or her family members); *United States v. Walker*, 191 F.3d 326, 338 (2d Cir. 1999) ("[i]n this circuit a district court may depart downward in sentencing a defendant due to the extraordinary family circumstances.").

As one District Court articulated, whether such a departure is warranted under a consideration of extraordinary family circumstances, "the only relevant question to take into account is the impact of incarceration on innocent dependents." *United States v. Wilkerson*, 183 F. Supp. 2d 373 (D. Mass. 2002). As such, one of the primary factors the Court should consider is whether there is an adequate substitute to replace the defendant in caring for the defendant's dependents. *See United States v. Huerta*, 371 F.3d 88, 95 (2d Cir. 2004) (the absence or presence of adults who can step in during the defendant's incarceration to assist with caring and providing for the defendant's dependents—is a central part of the extraordinary family circumstances inquiry); *United States v. Roselli*, 366 F.3d 58 (1st Cir. 2004) ("downward departure from Sentencing Guidelines based on extraordinary family circumstances may be appropriate where care provided to relative by defendant is irreplaceable or otherwise extraordinary"); *see also Burgos v. United States*, 10 CIV. 403 DAB, 2010 WL 4007289 (S.D.N.Y. Oct. 6, 2010) (imposing a downward variance under § 3553(a) given defendant's family circumstances); *United States v. Davis*, 07 CR. 727 (HB), 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (imposing a downward variance under § 3553(a) because "[a]ny term of imprisonment would be disastrous to [defendant's] family).

Here it is undisputed that Mr. Ekdeshman is an essential and irreplaceable caretaker for his two children.  While his wife will undoubtedly do her best to care for the children in Alex's absence, a single mother is no replacement for a father.[4]  Mr. Ekdeshman cares for, provides for, and contributes to the overall well-being of his entire family.  As described in the attached letters, he loyally attends his children's various school functions, provides for their needs and is generally an attentive family member. Furthermore, as described above, Alex's son, ███████ was struck with a cancerous tumor just last year.  Doctors were unable to remove his tumor because of its complex location, so ████████ remains under doctor supervision.  While ████████ is aware of his father's legal predicament that does not mean it is something with which ████████ has a comfortable resolution. Father and son share a deep bond.  Without a father present to help care for his son, ████████ may be exposed to complications associated with the stress of having an incarcerated father.  He has chosen to write the Court about the

---

[4] The detrimental effect of a single-parent family on child's well-being is multifaceted. For example, "evidence shows that adolescents from single-parent families are more likely than their peers from two-parent families to engage in health risk behaviors, including smoking, drinking, delinquency, violence, unsafe sexual activity, and suicide attempts."  Ming Wen, *Single-Parent Family Structure, Child Development, and Child Well-Being*, 3, (American Sociological Association, (2005)), (*citing* Blum, Beuhring, Shew, Bearinger, Sieving, & Resnick, 2000; Brody & Forehand, 1993; Dornbusch, Carlsmith, Bushwall, Ritter, Leiderman, Hastorf et al., 1985; Dornbusch & Gray, 1988; Garnefski & Diekstra, 1997; Garrison, McKeown, Valois, & Vincent, 1993; Green, S., West, & Ecob, 1990; Sokol-Katz & Ulbrich, 1992).

Previous research also demonstrates that "children from [a] single-parent family are more likely to suffer a disabling mental health condition, hyperactivity and conduct disorder, somatoform disorders, major and minor accidents, exposure to environmental tobacco smoke, stunting, and childhood disability."  *Id.* (*citing* Bronte-Tinkew & DeJong, 2004; Halfon & Newacheck, 1999; Lalloo, Sheiham, & Nazroo, 2003; Lund, Skrondal, Vertio, & Helgason, 1998; Newacheck & Halfon, 1998). The impact of being raised by a single parent on child's health can be lasting and far-reaching into various aspects of life. *Id.* It is conceivable that these mentally and physically disadvantaged children would have a harder time landing a successful adulthood.

special bond they share and how his father has been his rock during his cancer treatments:



According to the National Cancer Institute (the "Institute"), stress is a relevant concern for cancer patients. *See*, NATIONAL CANCER INSTITUTE, http://www.cancer.gov/about-cancer/coping/feelings/stress-fact-sheet, (last visited May 25, 2015). Arguably, given ▮▮▮▮▮ sensitive health, and the significant relationship Mr. Ekdeshman has in his children's lives, the impact to the innocent dependents in Alex's life would be significant. As such, we submit that such extraordinary family circumstances warrant that Your Honor pronounce a non-Guidelines sentence.

**2.** 

B. **THE SENTENCING GUIDELINES DO NOT HAVE A MONOPOLY ON THE GIVING OF SENTENCING ADVICE AND YOUR HONOR SHOULD CONSIDER OTHER RESOURCES, SUCH AS THE PROPOSED AMENDMENTS TO THE GUIDELINES, AS WELL AS THE ABA TASK FORCE RECOMMENDATIONS, BEFORE PRONOUNCING SENTENCE**

Effective 2005, after *Booker*, the Guidelines are advisory and are no longer the Court's only guidance for determining an appropriate punishment for the offense conduct involved in this matter.

1. **2015 RECOMMENDED AMENDMENTS TO U.S.S.G. §2B1.1 BY THE UNITED STATES SENTENCING COMMISSION**

On April 9, 2015 the United States Sentencing Commission (the "Commission") issued preliminary amendments to the Sentencing Guidelines for economic crimes.  *See* www.ussc.gov (last accessed June 2, 2015).  Amongst the recommended amendments the Commission made recommendations to amend the current guidelines on (i) intended loss; (ii) the victims table; (iii) sophisticated means; and (iv) fraud on the market.  *See* Federal Register Notice, available at www.ussc.gov/sites/default/files/pdf/amendment-process/federal-register-notices/20150430__FR__Amendments.pdf (last accessed June 2, 2015).  Updates to the Guidelines should bear on Your Honor's evaluation of Mr. Ekdeshman's case.  The Commission's recommendations, accepted by Congress, are scheduled to take effect on November 1, 2015.  Particularly relevant for Mr. Ekdeshman's case are the amendments regarding amount of loss and number of victims.

With regard to amount of loss, the Commission amended the loss table under §2B1.1.  Specifically, while the probation report defers to the 2014 Guidelines to provide for an 18-point enhancement for a loss calculation of $2.5 - $7 million dollars, the 2015 Commission has amended the threshold for that enhancement.  The new threshold for an 18-point enhancement is that the loss amount must exceed $3.5 million,

17

which exceeds the loss amount in this case.  *Id*.  According to the 2015 amendments, Mr. Ekdeshman would receive a 16-point enhancement rather than an 18-point enhancement lowering his guideline calculation by two points.

Additionally, the Commission recommended significant changes to the victim's table in §2B1.1.  Accordingly, the only enhancement based solely on the number of victims is a 2-point enhancement for 10 or more victims.  It no longer matters whether there were 50 or more victims.  As such, Mr. Ekdeshman would have received a 2-point enhancement for more than 10 victims, instead of 4-points.  In sum, under the 2015 amendments, Mr. Ekdeshman's total offense calculation should be 4 levels lower.

## 2. ABA TASK FORCE ON ECONOMIC CRIME SENTENCING[5]

In April 2013, the Criminal Justice Section of the American Bar Association created the Task Force on the Reform of Federal Sentencing of Economic Crimes ("the Task Force").  The Task Force was created to study the current weaknesses in the sentencing of economic crimes.  *Criminal Justice Task Force,* ABA, www.americanbar.org/groups/criminal_justice/economic_crimes_Taskforce.html  (last visited June 2, 2015). In November 2014, the Task Force proposed a rewrite of the federal fraud guideline, U.S.S.G. §2B1.1.  The Task Force's approach emphasized important offense characteristics that should be considered for sentencing.  In particular, the Task Force minimized weighting the loss table so heavily and instead focused on the culpability of the offender to come up with a better quantification of a sentencing range. *Id*.

Additionally, flaws with the current Sentencing Guidelines, as stated by the Task Force include that "th[e] structural framework...can be unduly rigid and lead to the

---

[5] We have attached a copy of the Task Force proposal for Your Honor's review as Exhibit "F."

arbitrary assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are less easily quantified. There is also a risk under the current structural framework that a guideline will appear to carry more empirical or scientific basis than is present." *ABA Task Force Final Report,* ABA, www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/economic_crimes.pdf (last accessed June 2, 2015).

Notably, in the District of Connecticut, Judge Chatigny took seriously the value of the ABA taskforce's recommendations for sentencing fraud under §2B1.1. In particular the judge applied the Task Force's recommended Guideline considerations— valuing culpability as bearing upon a final sentence. Despite the Government's request for a sentence range of 324-405 months and Probation's recommendation of 262-327 months, Judge Chatigny, relied upon the guidance of the ABA proposal and instead sentenced defendant Rivernider to 144 months. *United States v. Robert Rivernider, et al.*, No. 10 CR 222 (RNC) (D. Conn. Dec. 18, 2013). As Judge Chatigny stated when he relied upon the Task Force recommendation, "I think that there is much in the Task Force report that is helpful and I think that the guidance provided by their approach is preferable to what emerges from the existing guideline." Transcript of Record at 11-14, *United States v. Robert Rivernider, et al.*, No. 10 CR 222 (D.Conn. Dec. 18, 2013), available at www.nacdl.org/WorkArea/DownloadAsset (last visited May 25, 2015)). As a sister court in the Second Circuit, we submit that it would be appropriate for Your Honor to consider the *Rivernider* sentencing decision when the court imposes a sentence in this matter.

19

Here, we respectfully submit that that a non-Guidelines sentence is appropriate in this matter when Your Honor takes into consideration that this will be Mr. Ekdeshman's first time in jail, █████████████████, the non-violent nature of the offense conduct, and his extraordinary family circumstances.

## IV.   CONCLUSION

For the reasons set forth above, we respectfully urge the Court to impose a below-Guidelines sentence. Under these circumstances, such a sentence will be sufficient, but not greater than necessary, to satisfy all of the purposes of sentencing.

Dated:   June 4, 2015
      New York, New York

                        Respectfully submitted,

                        _____/s/_____

                        **Ronald P. Fischetti  (RF0509)**
                        Attorney for Defendant
                        Alex Ekdeshman

                        **FISCHETTI & MALGIERI LLP**
                        **747 Third Avenue, 20th floor**
                        **New York, New York 10017**
                        **212-593-7100**